UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | | |
|---|---|---|
| ANA ORTIZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case #1:09cv630 (GBL/JFA) |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| | ) | |
| Defendant. | ) | |

_____

MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

_____

Simon Y. Moshenberg, #77110
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
(703) 684-1100 / Fax: 703-684-1104
sym@robinhoodesq.com

Counsel for plaintiff

<u>Table of Contents</u>

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Plaintiff's Response to Defendant's Statement of Material Facts
  Purportedly Not In Dispute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Preliminary Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Facts Material to Defendant's Motion for Partial Summary Judgment . . . . . . . . . . . . . . 4

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    I.    Manuel Amestica Was a "Supervisor" Within
          The Meaning of Title VII Sexual Harassment Law . . . . . . . . . . . . . . . . . . . . . . . 13

          A.    Where a Sexual Harasser Is "Aided by the
                Agency Relationship" in Carrying Out His
                Harassment, the Employer Is Held Liable . . . . . . . . . . . . . . . . . . . . . . . . 13

          B.    A Jury Could Find That Manuel Amestica Was "Aided
                by the Agency Relationship" in Abusing Ana Ortiz . . . . . . . . . . . . . . . . 20

    II.   Defendant Is Not Entitled to the *Faragher*/*Ellerth* Defense . . . . . . . . . . . . . . . 24

          A.    Defendant's Dissemination of its Sexual Harassment
                Policy Only in English to a Largely Non-English
                Speaking Custodial Workforce Was Defective . . . . . . . . . . . . . . . . . . . . 24

          B.    Ana Ortiz Followed Defendant's Policy by
                Complaining to Jose Tobar, Who Did Nothing . . . . . . . . . . . . . . . . . . . . 28

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

<u>Background</u>

Ana Ortiz, a Salvadoran immigrant with very limited English, got a job with the Fairfax County Public Schools working as a custodian. Although as a matter of written policy the schools professed to employ only persons who could understand and communicate in English, this policy was honored in the breach. Ms. Ortiz's co-workers on the job included numerous workers who could not understand or communicate effectively in English.

Ms. Ortiz worked the evening shift at Langley High School under the supervision of Manuel Amestica, Assistant Building Supervisor. Ms. Ortiz spoke with Mr. Amestica in Spanish. She had limited contact with other school administrative personnel, including Jose Tobar, the Building Supervisor at Langley and the man to whom Mr. Amestica reported. Mr. Tobar worked the day shift. Supervision of the evening shift fell to Mr. Amestica.

As Ms Ortiz' supervisor, Mr. Amestica had plenary capacity to direct her work, to schedule her leave, to reprimand her as he saw fit, and to recommend her for more severe discipline up to and including termination. In practice, he also had a great deal of influence over her superiors' impressions of her performance and the content of her performance evaluations.

On several occasions over a period of months in 2006, Mr. Amestica cornered Ms. Ortiz while she was alone doing her custodial work and forced her to engage in unwanted sex acts. He threatened her with the loss of her job were she to refuse to comply or to complain. At first, scared and humiliated, she did not complain. Not having been given apposite instruction by the school board that she could be expected to understand, she did not know what to do. Her only prior experience in dealing with a matter of this sort was having been fired from a previous job after having complained that a co-worker had exposed himself to her. Afraid of losing her job,

as her supervisor had threatened, at first she did nothing.  She did not feel free to "walk away and tell the offender where to go."  *Mikels v. City of Durham*, 183 F.3d 323, 333-34 (4th Cir. 1999).

Once in the spring and once in the fall of 2006, Ms. Ortiz broached the issue with Mr. Amestica's supervisor, Jose Tobar.  While she did not elaborate on the physical sexual abuse she had suffered, she explained that Mr. Amestica was speaking to her and touching her inappropriately – language that Mr. Tobar understood to carry a sexual connotation.  Mr. Tobar responded that she should watch out about making accusations about others, as the accusations might redound to her own detriment.  Mr. Tobar told her that she was a "nobody" and that she would not be believed.  He told her that he himself had been accused of sexually harassing a school custodian, who was subsequently fired while he remained at his job.  (At least the former representation was in fact true.)  Mr. Tobar did nothing about the accusations of sexual harassment which Ms. Ortiz had brought to his attention, in violation of his formal obligation to report them up the chain of command.

In late 2006, Ms. Ortiz began attending a class given for non-English speaking school employees seeking advancement in the custodial field.  One class session, in January 2007, focused on the issue of sex harassment.  This was the first time that Ms. Ortiz learned that her employer had policies and procedures for dealing with victimization of the sort which she had been experiencing.  Ms. Ortiz tearfully told her teachers about the abuse she had suffered.  They reported Ms. Ortiz's complaint, and a formal investigation was commenced.  Mr. Amestica was ultimately fired, although he was not prosecuted because under Virginia law, rendering a victim fearful of losing a job does not constitute "force" of the sort needed to establish a charge of rape

or forcible sodomy.  Mr. Tobar, who admitted to receiving a complaint of sexual harassment

from Ms. Ortiz and doing nothing about it, was permitted to resign in lieu of termination.  As for

Ms. Ortiz, she went on short-term and then long-term disability, with benefits being paid by the

school board's insurer – a firm ever vigilant to receive ongoing confirmation of her inability to

work due to her post-traumatic stress disorder, as diagnosed by various mental health

practitioners.  After receiving benefits for the maximum allowable period of two years, Ms. Ortiz

commenced receiving  Social Security Disability benefits.

     Ms. Ortiz has sued her former employer under Title VII of the 1964 Civil Rights Act,

seeking damages for her victimization at the hands of Mr. Amestica.  In light of the analysis

favored by the Fourth Circuit regarding who may be considered a "supervisor" for purposes of

Title VII, plaintiff pleaded her principal claims (counts I and II(A)) naming Mr. Amestica, her

actual supervisor, as her supervisor for Title VII purposes.  Aware of more rigorous standards for

determining who is a supervisor in some other jurisdictions, however, in an abundance of caution

plaintiff's counsel included, expressly in the alternative, a count assuming Mr. Amestica's status

as a co-worker rather than her supervisor.  The board now seeks dismissal of counts I and II(A),

on the ground that Mr. Amestica was not Ms. Ortiz's supervisor for purposes of Title VII.


### Plaintiff's Response to Defendant's Statement
### of Material Facts Purportedly Not In Dispute

#### Preliminary Note

     Defendant's moving papers contain no itemization of allegedly undisputed material facts,

as appropriate under Fed. R. Civ. P. 56.  Rather, it sets forth fifteen pages of narrative text in

block paragraphs, mixing without distinction (a) undisputed material facts, (b) undisputed

immaterial facts, and (c) disputed material facts.[1]  While the board's presentation may serve its interest in undermining Ms. Ortiz's credibility as a witness, it does not assist in the adjudication of the motion it has presented to the court.  To the contrary, this form of presentation creates difficulty for assessing the merits of the motion, the factual portion of which must be disaggregated to determine whether *uncontested material fact*s have been presented capable of supporting the motion at bar.  Setting aside gratuitous bad-mouthing of Ms. Ortiz, the material issues here are few: (1) Was Mr. Amestica a supervisor for purposes of sexual harassment law under Title VII; (2) if so, did the board sufficiently disseminate to Ms. Ortiz its policies and procedures regarding how to deal with sexual harassment; and (3) if so, did Ms. Ortiz unreasonably fail to follow those policies and procedures.  For her part, Ms. Ortiz here identifies the discrete material factual points, both contested and uncontested, which she believes bear on the adjudication of defendant's motion.

        Facts Material to Defendant's Motion for Partial Summary Judgment

        Ms. Ortiz respectfully submits that the following facts, both disputed and undisputed, are material to the adjudication of the board's motion.  Assertions which directly or by implication dispute the board's statement of material facts purportedly not in dispute are marked by asterisk.

---

        [1]Material facts are facts material to the adjudication of this motion.  An example of an undisputed material fact is: "During all times that Ortiz was employed by the School Board, the School Board had a written sexual harassment policy."  Def. Mem. at 4.  An example of an undisputed immaterial fact is: "In June 2006 . . . Ortiz began a sexual relationship with a married coworker from Inova, Manuel Campos.  At the time, Ortiz was still living with the father of her two daughters."  Def. Mem. at 10.  An example of a disputed material fact is: "No one told Kerr [the school's investigator] that he or she had seen Amestica sexually harassing Ortiz or any other women at the school."  Def. Mem. at 15.  (In fact, Wing Leung told Mr. Kerr that Mr. Amestica "would touch the women here, and they didn't like it. . . .  I saw them touch Ana and Maura . . . I am an eye witness."  Def.'s Exh. 43, Stephen Kerr interview with Wing Leung, at 17.

*1.  Ms. Ortiz was hired by the schools notwithstanding that, like many of her coworkers, she understood next to no English beyond basic phrases related to cleaning tasks.  Exh. 2, Ana Ortiz Dep., at 69-70; Exh. 1, Ana Ortiz Decl., ¶ 2.  The "testing" to which employees were subjected for their English comprehension involved their being repeatedly asked the same questions related to cleaning tasks in ever-simpler terms.  Exh. 3, Toni Tate Dep., at 8-9.

*2.  The schools' touted "policy" of hiring only employees who could understand English was a policy for the books alone and honored in the breach. This is self-evident in the case of Ms. Ortiz and several of her co-workers, including two (Maura Ferman and Wing Leung) for whom this court had to obtain interpreters to ensure that they understood the need to abide by subpoenas and court orders.  *See* Dkt. #116, Order to engage Mandarin and Spanish interpreters. The school's investigator, Stephen Kerr, arranged for Spanish interpreters before interviewing Ms. Ortiz and her coworkers regarding her case, as his experience with the schools taught him that translation was necessary to sustain any meaningful conversation with most custodians.  *See* Exh. 4, Stephen Kerr Dep., at 39-42; Exh. 10, e-mails to and from Stephen Kerr.  Of the twelve custodian coworkers of Ms. Ortiz that Mr. Kerr interviewed, eight required interpreters.  *See* Def.'s Exh. 43, Kerr notes of various interviews.  Several depositions of custodians took place with the assistance of Spanish interpreters, and interpreters will be needed at trial.

3.  At all relevant times, the school board had a policy and a regulation prohibiting sexual harassment and providing for employees to complain of sexual harassment.  Regulation 4950.2, defining sexual harassment, states, "A person should report complaints of sexual harassment to his or her principal, supervisor, or program manager. . . ."  Def.'s Exh. 11 at 2.

4.   Recognizing the inability of numbers of foreign-born employees to understand written instructions in English, the schools caused some of their policies, including specifically ones they deemed most important, to be translated into Spanish.  Exh. 5, Kevin North Dep., at 27-28. This included the board's sex harassment policy and regulation.  *See* Def.'s Exh. 12.  But the Spanish-language documents were not distributed to employees except online or upon specific request by an employee.  Exh. 5, North Dep., at 24.  Nor was it brought to the foreign-language-speaking employees' attention that translations of such material were available.  Exh. 1, Ortiz Decl., ¶ 3.

*5.   Accordingly, Ms. Ortiz remained unaware that the school board had a policy and regulation pertaining to sexual harassment.  *See* Exh. 2, Ortiz Dep., at 173-74.  A number of Ms. Ortiz's Spanish-speaking custodian coworkers also remained unaware of such a policy: for example, when asked of the board's sex harassment policies of which Ms. Ortiz professed ignorance until January 2007, Nelida Suyo, a monolingual Spanish-speaking custodial co-worker, testified that she never received training or reading material about the issue of sexual harassment.  *See* Exh. 6, Nelida Suyo Dep., at 7.

6.   When it was necessary for Ms. Ortiz to submit something in writing to the schools, such as her job application, she received assistance from persons fluent in English.  Exh. 2, Ortiz Dep., at 64, 203, 214.

7.   Prior to January 2007, the school board presented its sexual harassment policy to Ms. Ortiz at an orientation session on November 16, 2005.  Exh. 5, North Dep., at 51; *see also* Def.'s Exh. 5   During that orientation session, no Spanish-language interpreters were made available for the session on sexual harassment and other equity and compliance issues.  Exh. 5, North

Dep., at 51.  This is so notwithstanding that the school board employs a cadre of Spanish-language interpreters.  *Id.* at 26.  In contrast, the school board did provide language support to employees with questions about benefits and retirement forms, because the school board recognized these issues to be complex.  *Id.* at 52-54.

8.  At the November 16, 2005 orientation session, Ms. Ortiz was given a 98-page manual, written entirely in English and unavailable in any other language.  *Id.* at 40.  Material references to sexual harassment are found within the manual in three locations.  *See* Def.'s Exh. 8 at 41, 58, 84.  The book tells employees that "[p]ersons should report complaints of sexual harassment to their principal, immediate supervisor, or program manager."  *Id.* at 84.

9.  Ms. Ortiz was unaware of the availability or relevance to her of a school board website.  Exh. 1, Ortiz Decl., ¶ 4.  She was not informed that she had a school board e-mail address, and she never accessed it during the years she worked there.  *Id.* ¶ 5.  She was thus unaware of the schools' bulletins or other postings on the school's website or e-mailed to her by the school.  She was also unaware that copies of the sexual harassment policy were available in Spanish upon request, as no-one had ever informed her, in a language she understood, about the existence of that policy, much less that copies were available in Spanish.  *Id.* ¶ 3.

10.  Ms. Ortiz worked the evening shift at Langley High School from 3 to 11 pm.  Exh. 2, Ortiz Dep., at 73-74.  Her supervisor was Manuel Amestica, Assistant Building Supervisor.  *Id.* at 94.  Like many of her coworkers, Ms. Ortiz spoke with Mr. Amestica exclusively in Spanish.  Exh. 1, Ortiz Decl., ¶ 6; Exh. 6, Suyo Dep., at 18; Exh. 8, Yanira Galeas Dep., at 22-23.

11. On a day-to-day basis, Mr. Amestica controlled Ms. Ortiz's work completely and unquestionably.  Exh. 2, Ortiz Dep., at 96, 98.  As her sole on-site supervisor for 7 hours of her 8-hour shift, Mr. Amestica had plenary capacity to direct her work, to reprimand her as he saw fit, and to recommend her for more severe discipline.  *Id.*

12. Mr. Amestica's job description states that he:

> [a]ssists with the . . . oversight/supervision of cleaning and maintenance activities . . . .  instructs custodial personnel and sets expected levels of performance . . . establishes work schedules . . . schedules and approves leave; counsels employees and adjudicates informal complaints through discussion; reports employees' work hours and performance; initiates disciplinary action as needed . . . . May supervise lower-graded employees, as assigned.

Def.'s Exh. 18.

13. Mr. Amestica's immediate supervisor was Jose Tobar, Building Supervisor at Langley High School.  Exh. 7, Jose Tobar Dep., at 63; *see also* Def.'s Exh. 15 at ¶¶ 12-13.  Mr. Tobar usually left the building at 4:00 or 4:30 pm, leaving his Assistant Supervisor, Mr. Amestica, in charge of the custodians including Ms. Ortiz.  Exh. 7, Tobar Dep., at 130.  Ms. Ortiz had limited contact with Mr. Tobar.  Like many of her coworkers, Ms. Ortiz spoke with Mr. Tobar exclusively in Spanish.  Exh. 1, Ortiz Decl., ¶ 7; Exh. 6, Suyo Dep., at 18; Exh. 8, Yanira Galeas Dep., at 22-23.

14. Ms. Ortiz had even less contact with Mr. Tobar's supervisor, Corey Bowerman, the Student Activities Director.  Mr. Bowerman never had any discussions with Ms. Ortiz.  His interactions with her were limited to directing her occasionally to perform a specific cleaning task, such a cleaning up a spill.  On such occasions, he sometimes had to repeat himself to make himself understood; Ms. Ortiz indicated her understanding by nodding her head.  Exh. 9, Corey

Bowerman Dep., at 47-48.  Otherwise, Mr. Bowerman communicated with the custodians, including Ms. Ortiz, through intermediaries.  *Id.* at 49.

*15.  On several occasions over a period of months in 2006, Mr. Amestica cornered Ms. Ortiz while she was alone doing her custodial work and abused her sexually.  He threatened her with the loss of her job were she to refuse to comply, or to complain.  Exh. 2, Ortiz Dep., at 120-21; 127-29; 143-44; 156; 163-64.

16.  After the first incident of forced sodomy, Ms. Ortiz did not complain.  She was scared and humiliated, and afraid of losing her job.  *Id.* at 124-26.  Ms. Ortiz did not feel free to "walk away and tell the offender where to go."  *Mikels*, 183 F.3d at 323-334.

17.  Ms. Ortiz's hesitancy in reporting the sexual abuse to which she had been subjected was a commonplace consequence of the abuse itself.  This has been noted so often by counselors, researchers, law enforcement officers and courts that it is uncertain whether the board will contest the phenomenon as such, rather than the appropriateness of its application to this case.  *See, e.g.*, *Pulinario v. Goord*, 291 F. Supp. 2d 154, 163-64 (E.D.N.Y. 2003) ("Rape is an under-reported crime.  Studies have shown that rape victims do not report rape, or delay in reporting, because of fear of mistreatment by police and hospital personnel, lack of support by family and friends, fear of rapist retaliation, and feelings of guilt and shame.  Many rape victims, in light of these popular misconceptions, delay in reporting a rape . . ."  (Internal citations omitted.)); *Moore v. Sam's Club*, 55 F. Supp. 2d 177, 189 (S.D.N.Y. 1999) ("Psychologists recognize the existence of rape trauma syndrome, one symptom of which is delayed reporting by the victim of the rape.").  *See also Castillo v. Evans*, 2009 WL 1817028, at *3 (N.D. Cal. June 24, 2009) (expert testimony that "rape victims are often fearful to talk about the rape, blame

themselves, fear they will not be believed, are more traumatized if the perpetrator threatens

them, and often delay reporting the rape."); *People v. Taylor*, 552 N.E.2d 131, 138 (N.Y. 1990)

(expert testimony that rape victims who know their assailants are less likely to report the rape at

all).

18.   Ms. Ortiz had not been given instruction by the school board in a language that she

could understand regarding what to do if sexually harassed.[2]  Exh. 1, Ortiz Decl., ¶ 3.  She was

frightened and did not know what to do.  Her only prior experience in dealing with a matter of

this sort was having been fired from a previous job after having complained to her boss that a co-

worker had exposed himself to her.  Exh. 2, Ortiz Dep., at 50, 55.

*19.   Once in the spring and once in the fall of 2006, Ms. Ortiz complained of Mr.

Amestica's abuse to Mr. Amestica's supervisor, Mr. Tobar, who was the Building Supervisor

and thus an appropriate recipient of complaints under the school board's sexual harassment

regulation. *Id.* at 132, 152.  While she did not elaborate on the sexual abuse she had suffered,

she explained that she was being spoken to and touched inappropriately by Mr. Amestica.  *Id.*

Mr. Tobar subsequently conceded to the school investigator that he had understood that what

was "inappropriate" was sexual in nature.  Exh. 11, Stephen Kerr notes of interview with Jose

Tobar, at ¶ 7.

*20.   Mr. Tobar's response was that Ms. Ortiz should watch out about making

accusations about others, as the accusations might redound to her own detriment.  Mr. Tobar told

---

[2]As is the case with the board's policy that employees  must be able to communicate in
English, the issue here is not whether certain words appeared in school board policies, but
whether those policies were reasonably accessible to a known monolingual Spanish-speaking
employee, so as to render them something other than a dead letter.

her that she was "nobody" and that she would not be believed.   He told her that he himself had

been accused of sexually harassing a school custodian who was subsequently fired while he

remained at his job.  Exh. 2, Ortiz Dep., at 133, 152; Exh. 12, Stephen Kerr memorandum, at 1.

At least the former was true.  *See* Exh. 15, Letter from Robert Graumann to Jose Tobar, at 1;

Exh. 12, Kerr memorandum, at 3.

   21.   Pursuant to the school board's regulation on sexual harassment, "[a]ny principal,

supervisor, or program manager who receives a complain of sexual harassment, or learns about

conduct that could be sexual harassment, is required to report immediately to the OEC[.]" Def.'s

Exh. 11 at 2.  The school board teaches its supervisors that "[t]he moment a responsible school

system employee learns of discrimination or harassment, the school system is considered to be

notified and is, therefore, required to investigate and remedy the problem."  Exh. 13,

*Understanding Equity and Compliance Issues: A Building Supervisors' Guide*, at Bates no.

6445.

   22.   Mr. Tobar, however, did nothing about the accusations of sexual harassment which

Ms. Ortiz brought to his attention.  As he confirmed to the school's investigator, he did not

report the matter to the Office of Equity and Compliance, as he was required to do under the

school board's sexual harassment regulation.  He simply "forgot about them."  Exh. 11, Kerr

interview with Tobar, ¶ 8 ("I completely forgot about it.").

   23.   Starting in late 2006, Ms. Ortiz attended a class given for school employees seeking

advancement in the custodial field.  This class, specially designed for custodians for whom

English was a second language.  The class met twice a week.  Once a week new material was

imparted, and once a week the class went over the material in simple English to make sure all of

the students understood it.  Some students would occasionally informally translate for other students.  Exh. 1, Ortiz Decl., ¶ 8.

24.  One of the topics addressed in a class in January 2007 was sexual harassment.  On this occasion, Ms. Ortiz learned for the first time that her employer had policies and procedures for dealing with victimization of the sort which she had been experiencing.  *Id.* ¶ 3; Exh. 2, Ortiz Dep., at 170, 173-74.  Shortly thereafter, she tearfully told her teachers, via a student interpreter, and then school officials, also via an interpreter, about what had been going on for months.  *Id.* at 175-76.

25.  Not long thereafter, Mr. Amestica was fired by the schools.  *See* Def.'s Exh. 44.  He was not prosecuted because the prosecutor determined that under Virginia law, threatening the loss of a job does not constitute "use of force" of the sort needed to establish a charge of rape or forcible sodomy.  *See* Def.'s Exh. 37 at 4.

26.  Mr. Tobar was permitted to resign from the schools rather than being fired for having failed to follow up on Ms. Ortiz's complaint of harassment.  *See* Exh. 14, Jose Tobar resignation.

27.  Ms. Ortiz went on short-term and then long-term disability, with benefits being paid by the school board's insurer contingent on its receiving ongoing confirmation of her inability to work due to her post-traumatic stress disorder stemming from the sexual assaults.  After receiving benefits for the maximum allowable period of two years, Ms. Ortiz commenced receiving Social Security Disability benefits.  Exh. 1, Ortiz Decl., ¶ 9.

Standard of Review

Summary judgment may be granted only where "there is no genuine issue as to any

material fact and [] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c)(2).  A fact is material if it "might affect the outcome of the suit under the governing law,"

and a factual dispute is genuine "if the evidence is such that a reasonable [factfinder] could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  "[A]ny permissible inferences to be drawn from the underlying facts must be viewed in

the light most favorable to the party opposing the motion."  *Miller v. Fed. Deposit Ins. Corp.*,

906 F.2d 972, 974 (4th Cir. 1990)  On this motion, plaintiff is entitled

> to have the credibility of [her] evidence as forecast assumed, [her]
> version of all that is in dispute accepted, all internal conflicts in it
> resolved favorably to [her], the most favorable of possible
> alternative inferences from it drawn in [her] behalf; and finally, to
> be given the benefit of all favorable legal theories invoked by the
> evidence so considered.

*Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).


## Argument

### I. Manuel Amestica Was a "Supervisor" Within The Meaning of Title VII Sexual Harassment Law

#### A. Where a Sexual Harasser Is "Aided by the Agency Relationship" in Carrying Out His Harassment, the Employer Is Held Liable

Title VII sexual harassment caselaw distinguishes between harassment perpetrated by a

supervisor and harassment perpetrated by a coworker.  In the former cases, liability is vicariously

imputed to the employer subject to an affirmative defense under *Faragher v. City of Boca Raton*,

524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).  In the

latter cases, liability is imputed to the employer only if the employer was negligent in responding

-13-

to the harassment.  Defendant Fairfax County School Board has moved for partial summary judgment  on Ms. Ortiz's cause of action for supervisor sexual harassment, arguing that the harasser Manuel Amestica was not a supervisor but merely a coworker of superior rank.  The Fourth Circuit's definition of "supervisor" for the purposes of sexual harassment actions under Title VII is thus central to this motion.  While offering abundant commentary on out-of-circuit law, defendant's brief is strikingly modest in its presentation of Fourth Circuit decisions.  As will appear, this is for good reason.

The leading Fourth Circuit case, *Mikels v. City of Durham*, defines supervisor sexual harassment as harassment that is "aided by the agency relation" between the supervisor and the employer.  183 F.3d 323, 331 (4th Cir. 1999), *quoting Ellerth*, 524 U.S. at 763.  Accordingly, "[t]he fundamental determinant of this form of vicarious liability is not, therefore, the harasser's formal rank vis-a-vis that of the victim in the particular employment hierarchy, though that is of critical and sometimes decisive evidentiary importance, but whether the particular conduct was 'aided by the agency relation.'" *Id.* at 331-32.  Defendant wholly ignores this analysis, which is, however, dispositive of its motion.

*Mikels* outlines two situations – "the boundaries of the root principle" – in which a judicial determination of the aided-by-agency question is clear.  On one end, any harassing conduct that culminates in a tangible employment action against the victim "is necessarily conduct aided by the agency relation.  At the other end, harassment by a fellow-employee having no authority of any kind over the victim never can be found aided by the agency relation to such employees, "the agency relation provides no aid for their conduct but workplace proximity, and that does not suffice for the purpose." *Id.* at 332 (internal citations omitted).  However:

> Between these extremes, there remains otherwise actionable
> harassment that, though it does not culminate in tangible
> employment action, is nevertheless 'aided by the agency relation,'
> as that may be demonstrated by other features of the employment
> relations between harasser, victim, and employer and the particular
> circumstances of its occurrence." *Id.*

Under this standard, whether an act of harassment was "aided by the agency relation" is a highly

fact-specific question, not subject to bright-line rules of the sort defendant would impose.

The Fourth Circuit's "aided by the agency relation" test for supervisory status in a sexual

harassment case is thus materially different from the test to be applied in a case alleging a

tangible employment decision such as discriminatory hiring, termination or compensation.

While the latter test employs a bright-line analysis, the former test is necessarily far more

nuanced.  Defendant's citation to *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277 (4th

Cir. 2004), a case alleging sex and age discrimination in firing, is thus entirely inapposite:  The

*Hill* case is the Fourth Circuit's leading case on the "cat's paw" theory of liability under Title

VII, plainly implicating tangible employment decisions, not harassment.  It does not purport to

address sexual harassment, or does it establish a standard for determining supervisory status in

harassment cases.

*Mikels* makes clear that an individual need not have the power to take "tangible

employment decisions" such as termination or reassignment in order for his sexual harassment to

be deemed "aided by the agency relation" within the meaning of *Ellerth*:

> Short of that most threatening form of supervisory authority [i.e.
> the power to fire], we may assume, without deciding here, that
> lesser forms derived from the agency relation may aid particular
> acts of supervisor harassment.  In such less clear circumstances,
> the victim's response in context may be highly probative on the
> issue

> whether any agency authority possessed by the harasser has
> actually aided his conduct by increasing her sense of vulnerability
> and defenselessness.

*Id.* at 333.  In memorably colorful and oft-cited language, the Fourth Circuit describes that

"where the level of authority had by a harasser over a victim – hence her special vulnerability to

his harassment – is ambiguous, the tip-off may well be in her response to it.  Does she feel free

to 'walk away and tell the offender where to go,' or does she suffer the insufferable longer than

she otherwise might?"  *Id.* at 334.

On the facts of *Mikels*, the harasser in that case was determined not to have been "aided

by the agency relation" where his authority "[a]t most [] would involve the occasional authority

to direct her operational conduct while on duty."  *Id.*  However, the most telling indicator of the

harasser's lack of supervisory status – "the clincher," as the Fourth Circuit described it – had

nothing to do with the powers formally allotted to the harasser's job description within the

employer's hierarchy, but rather was the victim's reaction to the harassment: Ms. Mikels

"rebuffed [the harasser] in an obscenity and profanity-laced outburst, rejected his immediately

proffered apology, and the next day filed a formal grievance against him."  *Id.* at 334 (internal

citations omitted).  As the Fourth Circuit observed, "That is not likely the conduct of one

'reluctant to accept the risks of blowing the whistle on a superior,' but more naturally the

conduct of one who thinks of her harasser as merely a fellow-employee from whose unwelcome

conduct she is free to walk away or whom she can 'tell where to go.'"  *Id.*

In determining whether a sexual harasser was "aided by the agency relation" within the

meaning of *Ellerth*, district courts within the Fourth Circuit have uniformly followed *Mikels* in

finding "the clincher" to be the victim's reaction to the harassment.  For example, in *Homesley v.*

-17-

*Freightliner Corp.*, 122 F. Supp. 2d 659, 663 (W.D.N.C. 2000), the sexual harasser "had no authority to hire, fire, or discipline" the plaintiff, nor did he have "the power to promote or fail to promote" or reassign her.  The extent of his formal power consisted of "report[ing] to his supervisor regarding the performance of group members" and assigning the plaintiff "to perform various welding jobs, depending on the plant's daily needs." *Id.*  Looking to the victim's reaction to the harassment, however, *Homesley* noted that her fear of retaliation caused her to "chicken[] out" and not report the harassment.  The victim "did not feel free to walk away and tell the offender where to go, and instead suffered the insufferable longer than she otherwise might."  This was sufficient to raise a genuine issue of material fact as to whether the harassment was "aided by the agency relation," thus making summary judgment inappropriate.  *Id.*

Likewise, in *Midgett v. Charleston County Sheriff's Office*, 2009 WL 5184337, at *5 (D.S.C. Dec. 17, 2009), the harasser lacked "the power to hire, fire, promote, demote, transfer or discipline Plaintiff."  The extent of his formal authority consisted of "giv[ing] Plaintiff poor evaluations and control[ling] her day-to-day workload."  The court held, however, that under *Mikels* "it is not necessary for the imputation of liability to an employer that a supervisor possess the power to 'hire, fire, promote, demote, transfer, or discipline,' so long as the harasser has the power to constitute a threat to the victim's employment conditions." *Id.* at *4.  Because there was "evidence in the record that Plaintiff did not wish to file a complaint against [the harasser] because Plaintiff feared the repercussions of such action," the court concluded that "a genuine issue of fact exist[ed] as to whether [the harasser] was Plaintiff's supervisor for the purposes of imputing liability to Defendant," thus making summary judgment inappropriate. *Id.* at *5.

The same analysis was followed in *Rasi v. Dep't of Corrections*, 2009 WL 102530, at *3 (W.D. Va. Jan. 14, 2009). "According to the Department, since [the harasser] could neither fire, promote, reassign, discipline, or review Rasi, nor alter her working conditions or increase her pay, [he] did not wield sufficient authority over RasI for his conduct to have been 'aided by the agency relation' as interpreted by the Fourth Circuit in *Mikels v. City of Durham*. This argument reads *Mikels* too narrowly." *Rasi* also noted that a harasser's conduct might be attributable to his employer, even absent actual supervisory authority, based on a theory of apparent authority. *Id.* at *4 n.3, *quoting Ellerth*, 524 U.S. at 759: "If, in the unusual case, it is alleged there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one."

Where a harassment victim *does* feel empowered to oppose the harassment, district courts will more readily find the harasser not to have been "aided by the agency relation." In *Church v. Maryland*, 180 F. Supp. 2d 708 (D. Md. 2002) as in *Jaudon v. Elder Health, Inc.*, 125 F. Supp. 2d 153 (D. Md. 2000), the victim clearly felt empowered to "walk away and tell [the harasser] where to go." *Church*, 180 F. Supp. 2d at 735; *Jaudon*, 125 F. Supp. 2d at 163. In neither case did the court find the harassment victim to have "any sense of special vulnerability of defenselessness deriving from whatever authority the alleged harasser possessed[.]" *Church*, 180 F. Supp. 2d at 735.

*See also* EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors (June 18, 1999) at §§ III.A.1 ("An individual whose job responsibilities include the authority to recommend tangible job decisions affecting an employee qualifies as his or her supervisor even if the individual does not have the final say."); III.A.2

("An individual who is authorized to direct another employee's day-to-day work activities qualifies as his or her supervisor even if that individual does not have the authority to undertake or recommend tangible job decisions."), *available at* www.eeoc.gov/policy/docs/harassment.html.

Defendant's citations to Seventh and Eighth Circuit cases are inapposite as they rely on a standard different from that prevailing in this circuit.  The circuits have held that in a sexual harassment case, a supervisor must be someone with the power to directly affect the terms and conditions of the plaintiff's employment.  *See, e.g.*, *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498 (7th Cir. 2004); *Joens v. John Morrell & Co.*, 354 F.3d 938 (8th Cir. 2004).[3]  This bright-line rule bears little in common with the Fourth Circuit's nuanced aided-by-agency analysis set forth in *Mikels* and routinely used by district courts in this circuit.

The only other Fourth Circuit case cited by defendant, *Howard v. Winter*, 446 F.3d 559 (4th Cir. 2006), is readily distinguishable from the instant case.  In *Howard*, a secretary provided administrative services to 55 staff members, one of whom was her harasser.  Not surprisingly, the *Howard* court held that "the authority possessed by [the harasser] over Howard was at best minimal" and he was not her supervisor.  *Id.* at 566 (internal citations omitted).  That by itself distinguishes the instant case, where Mr. Amestica was by title and by design Ms. Ortiz's sole supervisor.  (Nor did the *Howard* court base its analysis solely on whether the harasser had the power to take tangible employment actions against the complainant.  It described such power as merely "the most powerful indication" of supervisory status, not as constituting the sole test.  *Id.*)

---

[3]The Eighth Circuit erred in citing *Mikels*' fact-intensive "aided by the agency relation" analysis as supportive of its own bright-line "terms and conditions" test.

The Fourth Circuit's *Mikels* test for supervisory status in the context of sexual harassment cases under Title VII – that the harassment be "aided by the agency relation" – is, in sum, a far more nuanced and fact-specific analysis than defendant portrays in its brief. Defendant's reliance on the power to take tangible employment decisions as the sole indicator of supervisory status is a brutal misreading of *Mikels*.  It would take what the Fourth Circuit described as one of the "boundaries" of the root principle and convert it into an essential element.  Entirely absent from defendant's analysis is the *Mikels* court's plain statement that "the fundamental determinant of this form of vicarious liability is *not* [] the harasser's formal rank vis-a-vis that of the victim in the particular employment hierarchy[.]"  *Mikels*, 183 F.3d at 331-332.

> **B.  A Jury Could Find That Manuel Amestica Was "Aided**
> **by the Agency Relationship" in Abusing Ana Ortiz**

Although Mr. Amestica did not have the power to fire Ms. Ortiz or to transfer her to another job position, his day-to-day influence over her was markedly greater than defendant's brief suggests.  It was Mr. Amestica who told Ms. Ortiz what to do on any given day.  His orders were to be obeyed unquestioningly; as Ms. Ortiz described it, Mr. Amestica would give orders as if he were a god.  Exh. 2, Ortiz Dep., at 105.  Mr. Amestica was not merely another custodian at Langley High School with higher rank, a description that would apply to the rank of Custodian II (as opposed to the Custodian I position that Ms. Ortiz filled).  Mr. Amestica was the Assistant Supervisor of all custodians in the school, and as such, Ms. Ortiz was directed to follow his orders, not those of the Custodian II.  *Id.* at 98.  Mr. Amestica also scheduled and approved leave requests, and signed off on Ms. Ortiz's timesheets.  *See* Def.'s Exh. 18.

-22-

Mr. Amestica had a great deal of formal and informal influence over his superiors'
perceptions of Ms. Ortiz's performance.  Formally, Mr. Amestica's job description stated that he
"reports employees' work hours and performance; initiates disciplinary action as needed."  *Id.*
Informally, he also had a great deal of influence.  Defendant's "school-based administrator,"
Corey Bowerman, is the individual who would formally sign off on Ms. Ortiz's performance
evaluation; yet he frankly admitted that "90 percent" of his communication with the custodians
went through Mr. Tobar or Mr. Amestica, Exh. 9, Bowerman Dep., at 14; that he had no
regularly scheduled interactions with individual custodians, but rather interacted with them
through Mr. Tobar or Mr. Amestica, *id.* at 15-16; and that the extent of his personal interactions
with Ms. Ortiz consisted of occasionally directing her to do specific tasks such as cleaning up a
spill.  *Id.* at 47-48.  Mr. Bowerman would thus evaluate custodians "hand-in-hand" with Mr.
Tobar.  *Id.* at 37-38.  Mr. Tobar, however, left the building at 4:00 pm, whereas Ms. Ortiz's shift
went from 3:00 to 11:00 pm under the supervision of Mr. Amestica.  Accordingly, any
evaluation of Ms. Ortiz's job performance had to depend in largest part on information and
impressions received from Mr. Amestica, the ranking official in charge of Ms. Ortiz from 4:00 to
11:00 pm.

Mr. Tobar, who styled Mr. Amestica the "supervisor for the custodian staff" after he left
the building, recalled occasions in which Mr. Amestica reported to him about improper work or
misconduct by a custodian.  Exh. 7, Tobar Dep., at 130-31.  Ms. Ortiz thus reasonably and
correctly believed that Mr. Amestica could "tell Tobar that I wasn't doing a good job and [] he
would get another person."  Exh. 2, Ortiz Dep., at 129.  Indeed, pursuant to the school board's
formal hierarchy, a bad word from Mr. Amestica could be expected to make its way up the chain

to Human Resources, where formal employment action might be taken thereupon.  Mr. Amestica

thus had a great deal of control over Ms. Ortiz's advancement within the organization.

Mr. Amestica was the person in charge for 7 of Ms. Ortiz's 8 hours on the job every day.

He told her what to do, and she had no choice but to follow his instructions.  His level of formal

control over Ms. Ortiz was no less than that of the various harassers in *Homesley* (reporting on

the plaintiff's performance and assigning her to daily tasks as needed), *Midgett* (evaluating the

plaintiff's performance and controlling her day-to-day workload), or *Rasi* (directing the

plaintiff's day-to-day assignments and approving leave), all found to have been supervisors

within the meaning of Title VII sexual harassment law.

Ms. Ortiz had no reason to believe that Mr. Amestica was anything but her supervisor.

His job title, after all, was "Assistant Building Supervisor."  As the board's "designated school

official," Corey Bowerman explained, Mr. Amestica's "responsibilities were to supervise the

night crew"; he was the "person in charge" of the custodians after Mr. Tobar left the building.

Exh. 9, Bowerman Dep., at 43.  Likewise, as Mr. Tobar explained that when he left the building,

Mr. Amestica "would be the supervisor for the custodian staff."  Exh. 7, Tobar Dep., at 130.  In

the circumstances, Ms. Ortiz had every reason to consider Assistant Supervisor Amestica, who

did actually supervise her, to be her "supervisor," regardless of the school board's after-the-fact

effort to minimize his role.  Even were Mr. Amestica not actually a "supervisor" under *Mikels*,

he would plainly qualify as a supervisor under a theory of apparent agency, pursuant to *Ellerth*,

524 U.S. at 759, and *Rasi*, 2009 WL 102530, at *4 n.3.

Here as in *Mikels*, "the clincher" is Ms. Ortiz's reaction to the harassment.  Mr. Amestica forcibly sodomized Ms. Ortiz twice before she was able to gather up the courage to approach Mr. Tobar to complain in any way.  After Mr. Tobar himself also threatened her into silence, Mr. Amestica was able to rape Ms. Ortiz three more times before she went back to Mr. Tobar to demand that he act on her original complaint.  Asked at her deposition, "You thought that you had to have sex with your boss as part of your job; is that what you're saying?," Ms. Ortiz answered, "I was afraid to tell them, that they would fire me from my job."  Exh. 2, Ortiz Dep., at 126.  *See also id.* at 139 ("Q: How did he get your mouth to open? . . . .  A: Because he was telling me that if I wouldn't do what he said, he would do everything possible to have me fired from my job.").  Notably, the police detective assigned to investigate the case determined that Ms. Ortiz performed the sex acts in question not because she wanted to nor because Mr. Amestica physically forced her, but rather because she feared losing her job if she did not.  *See* Def.'s Exh. 37 at 4 ("he told her that no one would believe her and she said that she 'really needed to be able to work [so she complied].'").  Ms. Ortiz clearly did not feel free to "walk away and tell [Mr. Amestica] where to go."  To the contrary, she "suffer[ed] the insufferable" for a great deal longer than she would have if she understood Mr. Amestica to be a mere coworker. *Mikels*, 183 F.3d at 333-34.

For these reasons, a reasonable jury could conclude that Mr. Amestica's harassment of Ms. Ortiz was "aided by the agency relation" within the meaning of *Mikels*.  Whether Mr. Amestica was thus her "supervisor" for purposes of Title VII is thus a question of fact for the

jury, not summary judgment.[4]

II.  Defendant Is Not Entitled to the *Faragher/Ellerth* Defense

    A.  Defendant's Dissemination of its Sexual Harassment
        Policy Only in English to a Largely Non-English
        Speaking Custodial Workforce Was Defective

An employer is vicariously liable for sexual harassment perpetrated by a supervisor,

subject to the *Faragher/Ellerth* affirmative defense, on which the defendant bears the burden of

proof.  The first prong of such defense requires the employer to prove that it "exercised

reasonable care in preventing and promptly correcting any sexually harassing behavior."  *Barrett*

*v. Applied Radiant Energy Corp.*, 240 F.3d 262, 265 (4th Cir. 2001).  While "[d]istribution of an

anti-harassment policy provides compelling proof" of such reasonable care, this proof may be

rebutted by showing that the policy was "defective or dysfunctional."  *Id.* at 266.

---

[4]Ana Ortiz also states a claim for *quid pro quo* sexual harassment by a supervisor, for
which the employer is liable without the possibility of an affirmative defense.  She alleges that
Manuel Amestica declined to make good on his various threats precisely because she submitted
to his sexual demands.  While recognizing that this argument is foreclosed under current Fourth
Circuit precedent, *see Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 267 (4th Cir.
2001), plaintiff respectfully submits that this court, and the Fourth Circuit, should adopt the
holdings of *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 96 (2d Cir. 2002) (rejecting the proposition
that "an employee's acquiescence in a supervisor's sexual abuse under a threat of a tangible
employment action (such as termination) is not itself a tangible employment action because the
threatened action is never carried out."), and *Holly D. v. Calif. Inst. of Tech.*, 339 F.3d 1158,
1171 (9th Cir. 2003) (holding that when "the victim submits to her supervisor's demands and is
hired, promoted, not fired, or not demoted because she has been successfully coerced into
engaging in sexual acts with him, she is also directly injured by the employment action.").  *See*
*Royal v. Potter*, 416 F. Supp. 2d 442 (S.D. W.Va. 2006) (following *Jin* and *Holly D.*).  Ms. Ortiz
does not propose to argue this theory further to this court, and preserves it here for the record.

Adoption of a sexual harassment policy does not suffice to make out the affirmative defense where that policy is not disseminated to the relevant group of employees including the plaintiff.  *See Faragher*, 524 U.S. at 808-09 (denying the affirmative defense where the employer "entirely failed to disseminate its policy against sexual harassment among the beach employees," the group of employees including plaintiff).  By the same token, to use the words of the *Barrett* court, it is "defective [and] dysfunctional" for an employer to make its employees aware of a sexual harassment policy only in English where most of the employer's custodial workforce is known to understand very little English.  *See Lopez v. Aramark Uniform & Career Apparel, Inc.*, 426 F. Supp. 2d 914, 964 (N.D. Iowa 2006) (showing a sexual harassment video in English to a largely Spanish-speaking workforce not effective dissemination of sexual harassment policy).

In granting the *Faragher/Ellerth* defense, numerous courts have emphasized that the employer *did* distribute its sexual harassment policy in languages its employees could be expected to understand.  *See, e.g.*, *Sandoval v. Am. Building Maintenance Indus., Inc.*, 552 F. Supp. 2d 867, 899-900 (D. Minn. 2008), *cited in* Def.'s Mem. at 22-23; *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864, 870 (9th Cir. 2001).  Likewise, in granting injunctions under Title VII against employers with multilingual workforces, courts have required that a sexual harassment policy be distributed in all languages the employees speak.  *See, e.g.*, *EEOC v. Sunfire Glass, Inc.*, 2009 WL 976495, at *14 (D. Ariz. April 10, 2009).  *Cf. Landon v. Plasencia*, 459 U.S. 21, 39 (1982) (notice in English of charges against Spanish-speaking immigrant insufficient as a matter of due process); *Prevot v. Phillips Petrol. Co.*, 133 F. Supp.2d 937, 939-41 (S.D. Tex. 2001) (refusing to enforce English-language arbitration agreement

against monolingual Spanish-speaking employees).

Here, the evidence shows that defendant's sexual harassment policy was distributed in English but not in Spanish. The relevant portion of Ms. Ortiz's orientation session on November 16, 2005, was given only in English, even though language support was available for other portions of that same session. *See* Exh. 5, North Dep., at 51-54. Likewise, the 98-page manual distributed at that session, containing three brief material references to sexual harassment, was available only in English. *Id.* at 40. No other document that defendant claims to have given to Ms. Ortiz referencing the sexual harassment policy was provided in Spanish. *See* Def.'s Mem. at 6. There was no reason for Ms. Ortiz to know that she could visit a certain website, or make a specific request to a school administrator, to obtain a Spanish translation of a policy the existence of which was never explained to her in the first place. She knew nothing about any of this.

In *Brewer v. Cornerstone Nutritional Labs, Inc.*, 2008 WL 222681, at *4 (D. Utah, Jan. 25, 2008), the court agreed that "a failure to disseminate the policy in a form understandable by Cornerstone's employees would likely indicate a failure to take reasonable measures to prevent sexual harassment[.]" In that case, the plaintiff was found not to have introduced evidence that a significant number of employees could not speak English. Here, however, the record is replete with evidence that like Ms. Ortiz, most of the custodial workforce at Langley High School understood very little English. Although the school board maintains a formal policy that all employees must speak English, this policy was honored in the breach. The individual responsible for verifying potential employees' English-language ability during the hiring process, Toni Tate, testified that she used no specific criteria to determine who spoke sufficient

English to perform the job, and that in the course of an interview, "if there was a language barrier, I would pretty much make sure they understood my questions" by repeating them over and over again in ever simpler language.  Exh. 3, Tate Dep., at 6-7, 8-9, 11.  Ms. Tate estimated that she rejected only 1% of applicants for the job of Custodian I due to language issues.  *Id.* at 12.  Accordingly, when the school's investigator, Stephen Kerr, decided to interview Ms. Ortiz's coworkers, he first arranged for Spanish interpreters, as his experience with the schools made it self-evident to him, before having even spoken to the first one, that translation would be necessary to sustain any meaningful conversation with most custodians.  *See* Exh. 4, Kerr Dep., at 39-42; Exh. 10, Kerr e-mails.  Ultimately, three-quarters of Mr. Kerr's interviews with Ms. Ortiz's custodian coworkers – eight out of twelve – could only go forward with the aid of interpreters.  *See* Def.'s Exh. 43.  Ms. Ortiz and most of her coworkers spoke to their supervisors, Mr. Amestica and Mr. Tobar, exclusively in Spanish.  Exh. 6, Suyo Dep., at 18; Exh. 8, Galeas Dep., at 22-23.  The court knows of these issues from its courtroom dealings with custodians Ferman and Leung.

Such evidence distinguishes the instant case from *Samedi v. Miami-Dade County*, 206 F. Supp. 2d 1213, 1221 (S.D. Fla. 2002), in which the plaintiff presented no evidence that the defendant "has any permanent employees who are unable to read English" or that "other than herself, there were even any temporary employees who spoke Creole and could not read English."  Even *Samedi* left open the possibility that under some circumstances, "posting in foreign languages might be a requirement of reasonableness[.]"  *Id.*

The school board recognized that it had a great number of employees whose English is not sufficient to understand important and complicated matters.  For that reason, it maintained a

staff of in-house translators and provided language support to its custodial employees at various

times, such as when they had to fill out complex benefit forms.  Exh. 5, North Dep. at 54.  This is

also why the school board ran a separate custodial supervisor class for speakers of English as a

second language, in which one class session per week was devoted to reviewing the material in

simple English to make sure all of the students understood it.  Exh. 1, Ortiz Decl. ¶ 8.  Indeed,

recognizing that preventing sexual harassment was one such important and complicated matter,

the school board produced a Spanish-language copy of its sexual harassment policy.  *See* Def.'s

Exh. 12.[5]  But the board failed to take the critical next step of disseminating the

Spanish-language policy to its Spanish-language employees, or even making them aware of its

availability.  This failure of dissemination is "defective or dysfunctional" within the meaning of

*Barrett*, such that defendant has failed to meet its burden of proof on the first prong of the

*Faragher/Ellerth* defense.  *See Faragher*, 524 U.S. at 808-09 (denying affirmative defense

where, although employer city did distribute its sexual harassment policy to most employees, it

did not distribute it to those employees who worked on the city's beaches, the group of

employees including plaintiff).

      B.  Ana Ortiz Followed Defendant's Policy by
           <u>Complaining to Jose Tobar, Who Did Nothing</u>

Ana Ortiz unwittingly followed defendant's stated sexual harassment policy by

---

[5]The concerns expressed by the Fourth Circuit in *Aleman v. Chugach Support Servs.*, Inc., 485 F.3d 206, 217-18 (4th Cir. 2007), that a translation requirement "could require translations in many different languages, and the quality and accuracy of the translations would likely be at issue," are not relevant here where the school board has already endeavored to produce a Spanish-language version of its sexual harassment policy using its in-house Spanish translators, the quality and accuracy of which is not contested by either party.

complaining of Manuel Amestica's sexual harassment to his supervisor Jose Tobar.  Regulation 4950.2 provides that "[a] person should report complaints of sexual harassment to his or her principal, supervisor, or program manager."  Def.'s Exh. 11 at 2.  Those individuals are, in turn, required to report any information about conduct that could be sexual harassment – whether or not styled as a formal complaint of sexual harassment – to the Office of Equity and Compliance. *Id.*  This is why, when Ms. Ortiz asked in her custodial supervisor class in January 2007 to whom a custodian should complain if the harasser was their supervisor, she was correctly instructed to complain to the Building Supervisor – Mr. Tobar.  Exh. 2, Ortiz Dep., at 173-74.  As the school board's own training manual for building supervisors such as Mr. Tobar states, "[t]he moment a responsible school system employee learns of discrimination or harassment, the school system is considered to be notified and is, therefore, required to investigate and remedy the problem."  Exh. 13, *Understanding Equity and Compliance Issues*, at Bates no. 6445.

Ms. Ortiz admittedly did not tell Mr. Tobar that Mr. Amestica had raped her.  But neither the law nor the schools' policy requires an employee to lay out all of the humiliating details of their harassment in order for their complaint to be taken seriously.  Ms. Ortiz told Mr. Tobar that Mr. Amestica had spoken to her and touched her inappropriately.  *Id.* at 132, 152.  Mr. Tobar understood this to refer to sexually inappropriate behavior by Mr. Amestica.  Exh. 11, Kerr interview with Tobar, at ¶ 7.  Indeed, the second time Ms. Ortiz complained to Mr. Tobar, in the fall of 2007, she reminded him that she had already once told him some months earlier that Mr. Amestica had been touching her sexually.  Exh. 2, Ortiz Dep. at 152.  Unwanted sexual touching constitutes sexual harassment under both Title VII and the schools' policy.  Ms. Ortiz gave Mr. Tobar ample information to place him on notice that Mr. Amestica was sexually harassing her.

Mr. Tobar was required to report Ms. Ortiz's complaint to the Office of Equity and Compliance. Instead, he simply ignored the matter. Exh. 11, Kerr interview with Tobar, at ¶ 8. Worse, he himself threatened Ms. Ortiz with the possible loss of her job were she to press her complaints of sexual harassment any further. Exh. 2, Ortiz Dep., at 133, 152. He is the one who was out of compliance with the board's policy, not Ms. Ortiz.

Conclusion

For the foregoing reasons, defendant's motion for partial summary judgment should be denied.

Respectfully submitted,

ANA ORTIZ,

By counsel

Dated: March 25, 2010

Counsel for plaintiff:


//s// Simon Y. Moshenberg
Simon Y. Moshenberg, #77110
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
(703) 684-1100 / Fax: 703-684-1104
sym@robinhoodesq.com
OrtizAna\Pleadings\OppDefMPSJ

-33-

<u>Certificate of Service</u>

     I, Simon Y. Moshenberg, hereby certify that on this 25th day of March 2010, I electronically filed the foregoing Memorandum in Opposition to Defendant's Motion for Patrial Summary Judgment, and all accompanying exhibits, with the clerk of the court, which will notify counsel of same.

          Sona Rewari, Esq.
          Hunton & Williams
          1751 Pinnacle Drive, #1700
          McLean, VA 22102

                     <u>//s// Simon Y. Moshenberg</u>
                     Simon Y. Moshenberg, #77110
                     Victor M. Glasberg, #16184
                     Victor M. Glasberg & Associates
                     121 S. Columbus Street
                     Alexandria, VA  22314
                     (703) 684-1100 / Fax: 703-684-1104
                     <u>sym@robinhoodesq.com</u>

                     Counsel for plaintiff